# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEVIN YELVERTON,** | : | **CIVIL ACTION** |
| | : | |
| **Petitioner,** | : | |
| **v.** | : | **NO. 19-4796** |
| | : | |
| **MICHAEL CLARK,  et al.,** | : | |
| | : | |
| **Respondents.** | : | |

## AMENDED HABEAS PETITION AND CONSOLIDATED MEMORANDUM OF LAW

Kevin Yelverton, through counsel, hereby submits this amended habeas petition and consolidated memorandum of law. He seeks habeas relief based on the grounds below and those set out in his pro se habeas petition. To the extent that the Court determines that further factual development is necessary on any of Yelverton's habeas claims, he requests an evidentiary hearing.

## I.      Background

### A.      Trial

In 2005, a jury sitting in the Philadelphia Court of Common Pleas found Yelverton guilty of second-degree murder and possession of an instrument of crime. The conviction arose out of the June 10, 2003 shooting death of David Nelson on Pennsgrove Street, west of 54th Street. At trial, the Commonwealth relied on forensic evidence and testimony from two purported eyewitnesses: Nelson's brother, Tyrek, and Christopher Thomas, as well as other evidence described below. Attorneys Barbara McDermott and

Regina Coyne represented Yelverton; Assistant District Attorney Yvonne Ruiz represented the Commonwealth.

Tyrek testified that the day before the homicide, Yelverton and David had an altercation regarding something that Yelverton said was missing from his apartment. N.T. 8/29/05 at 20-24.[1] The following evening, Tyrek testified that he was outside playing dice with his brother and some other men. *Id.* at 25-26. David, who Tyrek said carried a revolver, left the game first, and about 20 minutes later Tyrek also left. *Id.* at 28, 32-33, 45-46. As Tyrek was walking on Conestoga Street toward Pennsgrove Street, he heard a gunshot. *Id.* at 34. Upon reaching the corner of Pennsgrove and Conestoga, he saw Yelverton standing over the top of David, "gripping around him, grabbing him," although he could not see what Yelverton was doing and could not see Yelverton's hands. *Id.* at 35-39, 96. Tyrek said he then saw Yelverton fire three gunshots at David and run across 54th Street. *Id.* at 39-40. Tyrek said he was able to identify Yelverton after the first shot, although initially he could not tell that Yelverton or David was involved. *Id.* at 35, 40.

About three weeks after the homicide, Tyrek said, he spoke with Yelverton on Malik Easley's cell phone and Yelverton told him to "keep it on the streets" regarding the homicide. N.T. 8/29/05 at 55; *id.* at 54-55. Tyrek testified that he received a similar call from Yelverton a few weeks later. *See id.* at 136-37. During his testimony, Tyrek described incidents of alleged intimidation that the prosecution did not connect to

---

[1] In the interest of clarity and to be consistent with the approach taken by the Pennsylvania Superior Court, this filing uses the first names of members of the Nelson family.

Yelverton. Tyrek said that prior to trial he saw flyers in the neighborhood identifying him as a "snitch" and that someone from the neighborhood performed a threatening gesture by "making a gun to his head with his fingers." *Id.* at 49; *id.* at 48-52.

Tyrek was impeached based on the circumstances and the timing of when he came forward. Tyrek told the police on the night of the homicide that he did not know who shot his brother, and he did not make a statement incriminating Yelverton until 110 days after homicide, at which time he had gotten in a car accident after fleeing the police. *Id.* at 111-115, 46-48, 58-59. That incident only resulted in traffic tickets. *Id.* at 126-30; N.T. 8/30/05 at 58. During his interview with the police, Tyrek said that he did not know anyone else who was present for the shooting. N.T. 8/29/05 at 131. At trial, he said that he lied to the police about this. *Id.*

Christopher Thomas, who was Tyrek's friend, first spoke to the police six days after Tyrek, just after he had gotten arrested for receiving stolen property. N.T. 8/26/05 at 176, 178-79, 218. Thomas testified that he saw Yelverton shoot David twice, and that he saw Yelverton go through David's pockets in between the two shots. *Id.* at 160, 166. Thomas also testified that he saw Yelverton standing over the top of David and that he saw Yelverton with two guns. *Id.* at 160, 164, 167. Neither Thomas nor Tyrek testified that Yelverton took anything from David.

Thomas was impeached for misrepresenting his criminal history. On direct, he stated that he had one prior conviction, but on cross he admitted that he had been in custody and on probation for the previous five years because of three separate stolen-vehicle cases. 8/26/05 at 179-84. Thomas was also impeached with his original statement

to the police. In that statement, he told the police that he was together with Tyrek at the time of the shooting; at trial, he admitted that they were not together, although he said Tyrek "in general…was in my presence." *Id.* at 192; 191-93.

The Commonwealth also presented forensic evidence and testimony from law-enforcement officers. On July 22, 2003, about six weeks after the homicide, Yelverton was arrested after a brief chase during which police alleged that he discarded a .45-caliber handgun. N.T. 8/26/05 at 69, 72-82; N.T. 8/30/05 at 43-44. At the time, Yelverton stated that he possessed a BB gun. N.T. 8/26/05 at 78. The gun that the police recovered was destroyed before trial. N.T. 8/26/05 at 124-26; N.T. 8/30/05 at 91-92, 101.

At trial, the Commonwealth presented a property receipt for the alleged gun and expert testimony that a .45-caliber cartridge casing found on the night of the homicide on the east side of 54th Street, some forty feet from the homicide, matched a fired cartridge casing from the weapon. N.T. 8/30/05 at 43-44, 71-72, 87-89. Near that shell casing, the police also recovered one bullet jacket and one bullet jacket fragment. N.T. 8/30/05 at 71-72, 75-76. Neither of these items was fired from a .45, according to Police Officer John Finor. See *id.* at 97-98. Officer Finor testified that the bullet jacket and two other bullet jackets recovered by the medical examiner were fired from the same weapon, and that weapon was of a .38/.357-caliber class. N.T. 8/30/05 at 76, 81, 84. Officer Finor could not identify a specific firearm or caliber. *Id.* at 84-85. Officer Finor also testified that three other bullet jacket fragments that were recovered were not fired from a .45. *See id.* at 97-98.

A medical examiner testified that David died from gunshot wounds, and that none of the shots were fired from close range, or within three feet, as there was no evidence of soot or gunpowder on David's clothes or skin. N.T. 8/25/05 at 235, 240-45. A toxicology report determined that at the time of his death David had a blood alcohol of level of .170 percent; oxycodone and PCP were also found in his body. *Id.* at 237. The Commonwealth also presented proof of other ballistics evidence recovered from David's body and clothing, as well as David's wallet and his gun holster with a clip on it, all of which were recovered at the scene. N.T. 8/25/05 at 231, 233-38, 245; N.T. 8/26/05 at 35; N.T. 8/30/05 at 81-86.

In addition, Theresa Nelson, David and Tyrek's mother, testified for the Commonwealth. She stated that a few hours after the homicide Tyrek told her that Yelverton had committed the offense. *See* N.T. 8/30/05 at 174. On cross-examination, she was confronted with her prior police statement from one month after the homicide. In that statement, she told the police that she did not know any witnesses who were present and did not think Tyrek was present "because Kevin would have had to shoot Ty too." N.T. 8/30/05 at 179; *id.* at 178-84. When pressed about her prior inconsistent statement, she testified that she heard about Yelverton's involvement from other people in the neighborhood. *Id.* at 180-81. The defense failed to object to either of Theresa's hearsay statements regarding Yelverton's involvement.

The defense called witnesses Michael Hinton and Nakeata Hale. Hinton, who was good friends with Tyrek Nelson, testified that at the time of the homicide he was with Tyrek, Christopher Thomas, and Tyrone Blue on the steps of Blue's house on 55th and

Harmer Streets, which is a couple blocks from 54th and Pennsgrove Streets. N.T. 8/31/05 at 6, 16-17. Hinton said he heard three gunshots, and, after about ten minutes, he walked over to the scene. *Id.* at 16-18. He learned that David Nelson had been shot and hurried back to Blue's house to tell Tyrek, Thomas, and Blue, who were all still on the steps of Blue's house. *Id.* 18-19. Hinton said he told Tyrek that his brother had been shot and was on the way to the hospital, and that Tyrek responded that his brother would be all right. *Id.* at 21. Hinton said the men then went to a nearby bar, and soon learned that David had died. *Id.* at 22-26.

Hinton said he later attended a court appearance with Tyrek where he saw Tyrek testify against Yelverton, and that he confronted Tyrek and asked him why he lied about the case, as he not been present for the homicide. *Id.* at 29-32. Tyrek responded that he "didn't like that n*****," referring to Yelverton. *Id.* at 31-32.

Hale testified that Tyrek told her that he regretted not being there when his brother was killed, and if he had been, he could have protected him. N.T. 8/30/05 at 195-96. Hale, who was Yelverton's girlfriend at the time of the homicide, testified that she had dated Tyrek for a month in 2002. *Id.* at 192-94.

In rebuttal, the Commonwealth recalled Tyrek and Theresa. Tyrek testified that he did not know Hale, that he did not see Hinton on the night of the homicide, and that he had never had a conversation with Hinton in which he said he did not see the homicide. N.T. 8/31/05 at 90, 95. He also said that Hinton did not attend Yelverton's preliminary hearing with him. *Id.* at 90. Theresa testified that Hinton called her house from jail three or four months before the trial and informed her that he had been beaten up and harassed

6

by Yelverton and his friends. *Id.* at 98-101, 111-12. On cross-examination, Theresa testified that she did not mention this conversation to the prosecutor until the previous day when she learned that Hinton was going to be a witness. *Id.* at 112-13, 116-17.

In closing, defense counsel argued that Tyrek and Thomas did not testify truthfully. N.T. 9/7/05 at 15. Counsel highlighted that their testimony was at odds with the ballistics evidence, which was found some forty feet from David's body, and the medical examiner's testimony, which reflected that the shooting did not take place at close range. *Id.* at 15-23. Counsel also emphasized that the men only spoke to police months after the incident and after incurring criminal charges. *Id.* at 14-15, 28-30. She further highlighted that Tyrek told the police that he did not know any witnesses to the shooting and that, one month after the homicide, Theresa told the police that Tyrek was not present. *Id.* at 23-24, 28.

In her closing, the prosecutor contended that the evidence supported a verdict for first- and second-degree murder. *Id.* at 86-87. In support of second-degree, which she emphasized, she argued that Yelverton committed the homicide during a robbery. *Id.* at 86.[2] In support of first-degree, she noted that there were multiple shots to the body. See *id.* at 86-87. The prosecutor further argued that two guns were involved, that the .45 placed Yelverton at the scene, and that Yelverton shot David first with the .45, and then shot David with David's own gun. *Id.* at 76, 81-82. The prosecutor argued that the location of the shell casing and nearby bullet jacket and bullet jacket fragment could be

---

[2] The Commonwealth opted not to move on a separate robbery charge that it had brought against Yelverton. *See* N.T. 8/31/05 at 140, 142.

explained by the fact that they were kicked or somehow moved after the homicide. *Id.* at 76. The prosecutor did not explain how exactly David was shot with the .45 in light of the fact that the bullet jackets and bullet jacket fragments all came from a smaller caliber gun.

The jury asked multiple questions during deliberations, requesting all the exhibits, the full testimony of the medical examiner, and the full testimony of the two ballistics experts: Officers Robert Stott and John Finor. N.T. 9/7/05 at 136. The trial court denied the request for the full testimony but said that the jury could ask specific questions. *Id.* at 139-40. The jury responded by asking several questions about the ballistics evidence: "Was the ballistics evidence collected from the victim's clothing a fragment or jacket, and what was its caliber, if known?" and "How did the detectives tag the gun retrieved from the alley alleged thrown by the defendant given that it had a broken trigger guard?" *Id.* at 141, 162. The trial court responded by reading excerpts from the trial testimony. N.T. 9/8/05 at 8-13. The jury then asked, "What was the caliber of the bullet that entered the victim's chest?" N.T. 9/8/05 15-16. The judge answered, "The bullet jacket fragments recovered in this case were all fired from the same firearm, but they were not fired from the 45 that was recovered in this case. There is no specific testimony as to the caliber of the bullet that entered the victim's chest." *Id.* at 19-20.

The jury later reported that it was deadlocked, and the judge opted to excuse them for the day and instructed them to return the next morning to deliberate. *Id.* at 21-23. The following day, the jury asked two questions about the alleged altercation that took place between Yelverton and David Nelson the day before the homicide. N.T. 9/9/05 at 4, 7.

After deliberating for a third day, the jury asked to be excused for the weekend. *Id.* at 8.

The following Monday afternoon, the jury reached its verdict, acquitting Yelverton of

first-degree murder while finding him guilty of second-degree murder and possession of

an instrument of crime. N.T. 9/12/05 at 3, 6

Following the trial, Yelverton received a mandatory sentence of life without parole

for the homicide and a consecutive 16-to-48-month sentence for possession of an

instrument of crime. N.T. 10/24/05 at 22.

### B.      Post-Trial Proceedings

Yelverton sought relief without success on direct appeal and in an initial Post

Conviction Relief Act (PCRA) petition. *Commonwealth v. Yelverton*, No. 996 EDA 2006

(Pa. Super. Ct. Aug. 30, 2007) (non-precedential) (direct appeal); *Commonwealth v.

Yelverton*, No. 1040 EDA 2011, 2013 WL 11253450 (Pa. Super. Ct. Oct. 25, 2013) (non-

precedential) (PCRA). In 2013, Yelverton received an affidavit from Tyrek in which

Tyrek recanted his trial testimony, and Yelverton filed a second PCRA petition, relying,

in part, on that affidavit. *See* Amended PCRA Pet. filed July 16, 2014 (including Tyrek's

affidavit as Ex. A). In the affidavit, Tyrek stated that Yelverton was not the person who

shot and killed David and that he lied to police when he named Yelverton because the

officers offered to drop charges against him if he told them what they want to hear, which

was that Yelverton killed David. *Id.* Ultimately, after an evidentiary hearing, Yelverton

was denied relief, and the Superior Court affirmed the denial. *Commonwealth v.

Yelverton*, No. 148 EDA 2019, 2019 WL 4233887 (Pa. Super. Ct. Sept. 6, 2019) (non-

precedential). The relevant state-court opinions are discussed below.

In 2019, Yelverton filed a federal habeas petition. ECF No. 2. The Court appointed the Federal Community Defender Office and subsequently permitted counsel to file an amended habeas petition and memorandum of law. ECF Nos. 14, 17. Because of the ongoing coronavirus pandemic, Respondents agreed to waive the one-year statute of limitations in this case. *See* ECF No. 18 at 2. Counsel later sought several extensions because of the pandemic and other assignments.

III.    **Legal framework under 28 U.S.C. § 2254 and *Strickland v. Washington***

This Court's review of the relevant state court decisions is conducted under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Where a state court adjudicated the merits of a claim, a federal court can grant relief only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* at § 2254(d)(1), or involved "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* at § 2254(d)(2). A state court's decision is "contrary to" clearly established federal law if the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and reaches an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009). A state court's decision is an "unreasonable application" of federal law if the state court "unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should

apply." *Breakiron v. Horn*, 642 F.3d 126, 131 (3d Cir. 2011) (internal quotation marks omitted).

AEDPA's deferential standards of review do not apply to federal claims that were not adjudicated on the merits by the state court. *Cone v. Bell*, 556 U.S. 449, 472 (2009); *Jacobs v. Horn*, 395 F.3d 92, 110-11 (3d Cir. 2005). For those claims, habeas review is *de novo*. *Cone*, 556 U.S. at 472; *Bennett v. Sup't Graterford SCI*, 886 F.3d 268, 283 (3d Cir. 2018).

Ineffective assistance of trial counsel claims are governed by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a petitioner must prove "that counsel's representation fell below an objective standard of reasonableness" measured according to "prevailing professional norms." *Id.* at 688. Second, a petitioner must show "that the deficient performance prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The prejudice prong of *Strickland* is satisfied by showing a reasonable probability of reasonable doubt from even just a single juror. *Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (stating that petitioner must demonstrate "a reasonable probability that[] . . . at least one juror would have harbored a reasonable doubt").

## IV.    Grounds for relief

A.      **Claim One:** Trial counsel rendered ineffective assistance by failing to move to exclude evidence of a .45-caliber weapon and shell casing as a matter of state and federal due process.

1.      **Factual background**

At trial, the Commonwealth presented testimony from several officers related to a .45-caliber handgun. Officer Michael Ditizio testified that Yelverton was seen on July 22, 2003, carrying what Officer Ditizio said was a handgun. N.T. 8/26/05 at 69, 73, 80. Yelverton ran and tossed the alleged gun, which he told police was a BB gun. N.T. 8/26/05 at 76-78. Yelverton was arrested, and Officer Ditizio said that about 15 minutes later another officer recovered a .45-caliber handgun nearby. N.T. 8/26/05 at 91-93; *see also* N.T. 8/30/05 at 45-46. On cross-examination, Officer Ditizio said that when he first saw Yelverton he could not tell whether Yelverton had a BB gun or a regular gun. N.T. 8/26/05 at 100. The .45-caliber handgun was destroyed prior to Yelverton's trial, but the Commonwealth presented a corresponding property receipt and expert ballistics testimony regarding the gun and a shell casing found some forty feet from the homicide. N.T. 8/26/05 at 124-26; N.T. 8/30/05 at 43-44, 71-72, 87-89.

Officer Robert Stott testified that he examined the recovered firearm on July 25, 2003, and determined that it was a .45-caliber Heckler & Koch automatic. N.T. 8/26/05 at 118, 121. Officer Stott testified that the gun was operable and that as part of his test of a firearm, he recovers fired cartridge casings. 118-19. Officer Stott testified that he found out on the day of his trial testimony or the day before that the gun had been destroyed. *Id.* at 124, 126. For his testimony, he relied on the property receipt and a report that he prepared about the firearm. *Id.* at 115-21.

12

Officer John Finor testified that he compared the .45-caliber cartridge casing found on the night of the homicide with a shell casing that was test-fired from the .45-caliber handgun and that, "to a reasonable degree of scientific certainty," the casings were fired from the same firearm. N.T. 8/30/05 at 89; *id.* at 86-89. Officer Finor, who said he had conducted tens of thousands of examinations and testified about 700 times, said that this case was "one of a few times that the evidence was unavailable for me to be able to present it here." *Id.* at 92.

Prior to trial, the Commonwealth filed a motion in limine to admit the above evidence regarding the recovered .45 and the ballistics cross-check. *See* N.T. 4/27/05 at 14-15; Trial Ct. Op., 7/14/06, at 18-19.  At a pretrial conference, defense counsel did not oppose the introduction of the evidence. N.T. 4/27/05 at 14-15. Subsequently, prior to the start of trial, defense counsel raised an objection to Officer Finor's testimony regarding the shell casing. N.T. 8/25/05 at 175-79. Counsel cited the best-evidence rule, which generally requires the production of the "original writing, recording, or photograph." *See id.* at 178. The trial court did not rule on the objection. *Id.* at 179-80. Then, at time of Officer Finor's testimony, counsel did not renew the objection or challenge the admissibility of the testimony. N.T. 8/30/05 at 73-102. Counsel later requested and received a jury instruction about the destroyed gun. N.T. 8/31/05 at 130-39; N.T. 9/7/05 at 109-10. Counsel also challenged the admission of the evidence related to the .45 in a statement of matters on appeal, stating "that the trial court erred in permitting testimony for [sic] a firearms expert concerning a gun that had been destroyed by the Philadelphia Police Department." Statement of Matters Complained of on Appeal, 4/10/06, at 1 (¶ 3).

13

The trial court determined that the issue was waived and, alternatively, meritless. Trial

Ct. Op., 7/14/06, at 20. The trial court wrote,

> Assuming arguendo that the issue was not waived, the best evidence rule, codified in Pa. R.E. 1002, would not preclude Officer Finor's testimony concerning the tests he performed on the gun and his conclusion that the fired cartridge casing found at the scene was fired from the gun that the defendant had discarded. Pursuant to Pennsylvania Rules of Evidence, "to prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules, by other rules prescribed by the Supreme Court or by statute." Pa. R. Evid. 1002. The "best evidence rule" is not applicable because this matter does not involve a writing but instead involves a gun. The gun would constitute demonstrative evidence, i.e., the actual gun recovered. There is no requirement that all demonstrative evidence be produced at trial. Defense counsel did not raise an objection to the chain of custody related to the gun examined by Officer Finor. Inasmuch as Officer Finor's testimony pertains to the tests that he performed on the gun, his testimony and report concerning the tests he performed were the best evidence and were properly admitted. Accordingly, this issue is without merit.

Trial Ct. Op., 7/14/06, at 20. Counsel did not raise the issue in Yelverton's brief to

the Superior Court.

In a separate criminal case involving the .45-caliber gun, Yelverton was

charged with carrying a firearm without a license, carrying a firearm in public, and

possession of a firearm by a prohibited person. Ex. 1 (complaint); Ex. 2 (court

documents); Ex. 3 (docket sheet). In that case, Yelverton, who was represented by

different counsel, moved in limine to exclude the property receipt and the

corresponding report about the firearm. *See* Ex. 3 at 9; Ex. 4 (Trial Ct. Op.) at 1.

The trial court granted the motion, concluding that admission of the receipt and the

report would violate Yelverton's "Due Process rights and his right of

Confrontation under the United States and Pennsylvania Constitutions." Ex. 4 at 1. In reaching its decision, the trial court relied on *Commonwealth v. Deans*, 610 A.2d 32 (Pa. 1992), a Pennsylvania Supreme Court case upholding the exclusion of expert testimony following the destruction of evidence by the Commonwealth. Ex. 4 at 2-3. The trial court stated that the Commonwealth "has been given an unfair opportunity to examine and test this evidence that it failed to preserve for the defendant's examination. Therefore, the defendant's right to Due Process and Confrontation were violated." *Id.* at 2-3.

The trial court in the firearm case also included findings of facts and conclusions of law. In its findings of fact, the trial court noted that Yelverton claimed to have possessed a BB gun and that Yelverton was not given notice of the police's intention or actual destruction of the firearm. *Id.* at 3. The trial court then included the following conclusions of law: "The Court concludes that it is fundamentally unfair and in violation of the Sixth and Fourteenth Amendments of the U.S. Constitution and of Article 1, Section 5 of the Pennsylvania [] Constitution to allow the Commonwealth to introduce an incriminating property receipt and ballistic report for a firearm that it has accused the defendant of possessing without giving the defendant an opportunity to examine the firearm or test it." *Id.* at 3-4. The Commonwealth did not appeal this ruling, and the case was nolle prossed. Ex. 2 at 1-3; Ex. 3 at 10.

**2.     Legal discussion**

Under the federal constitution, due process requires "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 484 (1984). Here, Yelverton lacked the opportunity to challenge his possession of the .45 and the related expert testimony about the shell casing because the Commonwealth destroyed the gun before trial. In this situation, trial counsel rendered ineffective assistance by failing to raise a due-process objection to the admission of evidence related to the .45-caliber handgun, including the property receipt and the expert testimony from Officers Stott and Finor. As the trial court in Yelverton's gun case concluded, *Deans* is the key case.

That case involved an allegedly counterfeit lottery ticket. *Deans*, 610 A.2d at 32-33. The Pennsylvania Supreme Court barred the Commonwealth's expert testimony, reasoning that the destroyed lottery ticket was the primary evidence in the case, and that the defendant was denied an opportunity for an independent examination. *Id.* at 34.  It distinguished the situation at bar from cases in which neither party had access to the evidence: "It is one thing to conduct a trial in which neither side has evidence because the prosecution failed to take affirmative steps to preserve it, and it is quite another to conduct a trial in which the prosecution has evidence but the defense does not because the prosecution lost it." *Id.* While the *Deans* court noted that destroyed evidence need not be excluded in all cases, it suggested multiple factors be considered, including the importance of the evidence, whether it was destroyed before the defense had an opportunity to conduct an examination, and the reliability of the proposed expert testimony. *Id.* at 35-36.

16

In Yelverton's homicide case, as in his gun case, those factors support excluding evidence about the firearm. Most important, the gun was critical to the Commonwealth's case, as the prosecution used it to place Yelverton at the scene, while Yelverton maintained that he only possessed a BB gun and Officer Ditizio could not tell whether it was a real gun when he first saw it. *See* N.T. 9/7/05 at 76, 81; N.T. 8/26/05 at 78, 100. Second, it appears that the prosecution did not provide notice of its intent to introduce expert testimony about the .45 until after the gun was destroyed. *See* Ex. 4 at 3 (¶ 6) (noting neither Yelverton nor his attorney were given notice of the police's intention or actual destruction of the firearm); Trial Court Op., 7/14/06, at 19 (noting that the prosecution filed its motion in limine to introduce expert testimony about the gun on March 31, 2005).[3] Third, the firearms evidence is, in the words of *Deans*, "at least somewhat subjective." For one thing, Officer Ditizio could not initially tell whether Yelverton possessed a real gun, and his statement that it was a real gun is readily contestable. For another, the expert testimony that the shell casing found near the homicide was fired from the .45, "to a reasonable degree of scientific certainty," is subject to challenge, as courts have called into question the accuracy and reliability of such expert testimony. *See United States v. Green*, 405 F.Supp.2d 104, 108-09 (D. Mass. 2005) (restricting expert from testifying that a shell casing was fired from a specific weapon "to the exclusion of every other firearm in the world" because of concerns about the data and methodology supporting such opinion testimony).

---

[3] The exact date that the gun was destroyed is not clear from the record.

Yelverton suffered prejudice as a result of trial counsel's performance. The .45-caliber handgun and the shell casing were the most important forensic evidence in the case, and the prosecutor relied on it in her closing to implicate Yelverton in the murder. After first arguing that the .45 put him at the scene, N.T. 9/7/05 at 76, she contended "that what happens is the first shot does come from the 45 and that gets [David] down. [Yelverton] hits him with that shot and he goes down, which gives him the opportunity to go through his pants and he shoots him with his own gun." N.T. 9/7/05 at 81. The prosecutor's argument elevated the importance of the ballistics evidence, and it also, arguably, misstated the evidence, as there is no proof that David Nelson was shot with a .45-caliber handgun. In fact, the ballistics evidence demonstrated that the three recovered bullet jackets and four bullet jacket fragments all came from a gun that was from the .38- or .357-caliber class. N.T. 8/30/05 at 80-82, 84-85, 97-98.

Other factors support prejudice. Most important, this was a close case, as reflected by the jury's deliberations. Here, the jury deliberated over the course of four days, raised multiple questions about the ballistics evidence, and during its deliberations indicated that it was deadlocked. *See, e.g.*, *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 805-06 (3d Cir. 2020) (considering jury notes and requests among the indications that the verdict was a close call for the jury); *Silva v. Woodford*, 279 F.3d 825, 849-50 (9th Cir. 2002) (concluding that the jury's questions supported a finding of *Strickland* prejudice); *Reyes v. W. L. Montgomery*, 759 F. App'x 575, 578 (9th Cir. 2018) (non-precedential) (jury notes to trial judge requesting evidence helped show that constitutional error at trial prejudiced the defendant). And, ultimately, the jury acquitted Yelverton of the most

serious charge of first-degree murder, finding him guilty of second-degree murder and possession of an instrument of crime.

In addition, without the firearm, the jury was left with the disputed testimony of Tyrek Nelson and Christopher Thomas. As the defense argued in its closing, their testimony was suspect for many reasons: their delay in coming forward; the circumstances under which they talked to the police; and the conflicts between their testimony and the location of the ballistics evidence and the absence of evidence of a close-range shooting. In sum, the key witnesses were impeached, and their accounts of a close physical encounter did not match the evidence.

### 3. Yelverton can excuse the procedural default of this claim under *Martinez v. Ryan*

This claim was not fairly presented in state court during Yelverton's initial PCRA proceeding.[4] Yelverton can overcome the procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* applies when three conditions are met: "(a) the default was caused by ineffective assistance of post-conviction counsel or the absence of counsel (b) in the initial-review collateral proceeding (i.e., the first collateral proceeding in which the claim could be heard) and (c) the underlying claim of trial counsel ineffectiveness is substantial[.]"  *Cox v. Horn*, 757 F.3d 113, 119 (3d Cir. 2014) (internal quotation marks

---

[4] Yelverton raised the claim as one of multiple claims included in a second PCRA petition. Amended PCRA Pet., 7/16/04, at 4. The PCRA court dismissed the petition as untimely, and the Superior Court remanded the case for a hearing on another claim. *See Commonwealth v. Yelverton*, No. 3110 EDA 2016, 2018 WL 669285, at *4-5 (Pa. Super. Ct. Feb. 2, 2018) (non-precedential). Under state law, Yelverton was required to raise the instant claim during his first PCRA proceeding.

and citation omitted). Under *Martinez*, if the procedural default is excused, a court may

consider the merits of a petitioner's underlying ineffective assistance of trial counsel

claim. *See Bey v. Superintendent Greene SCI*, 856 F.3d 230, 244 & n.71 (3d Cir. 2017)

(applying *Martinez* to a procedurally defaulted claim).

Yelverton can satisfy the requirements of *Martinez*. In light of the importance of

the evidence related to the .45 and the ruling from the trial court in Yelverton's gun case,

PCRA counsel acted unreasonably in failing raise this claim. Further, for the reasons

above, the underlying ineffectiveness claim is substantial.

Yelverton's arguments about the ineffectiveness of trial and PCRA counsel are

bolstered by the fact that trial counsel did attempt to exclude expert testimony about the

shell casing under the best-evidence rule and later requested a jury instruction about the

destroyed firearm. Thus, trial counsel recognized the importance of the evidence related

to the .45 and had no strategic reason for allowing its admission. The fact that trial

counsel challenged the admissibility of evidence related to the .45 again in a list of

appellate issues also reflects trial counsel's recognition of the importance of this

evidence. Under these circumstances, it is clear that trial counsel performed

unreasonably, and that PCRA counsel could not have had a reasonable basis for failing to

raise this substantial claim of trial counsel ineffectiveness.

**B.**     **Claim Two:** Trial counsel rendered ineffective assistance by failing to seek a
          mistrial or curative instruction after the prosecutor committed misconduct by
          raising issues related to witness intimidation in front of the jury.

During the trial, the prosecutor asked the court officers to take the names of all the

people on Yelverton's side of the courtroom because of the prosecutor's concern about

witness intimidation. N.T. 8/26/05 at 144. The prosecutor made her comments to the

court officers in the presence of the jury and in a manner in which the jury could hear the

comments. *Id.* After the prosecutor's request to court officers, the following exchange

took place outside the presence of the jury:

> MS. COYNE: In the courtroom before we took the break, I objected to Ms. Ruiz instructing the court officers in the—while the jury is sitting a few feet away from her, instructing court officers to take the names of all of the witnesses that are present on the defendant's side of the courtroom because of issues regarding intimidation of witnesses. And that is being said in the presence and in the hearing of the jury.

> THE COURT: No conversations with counsel in the presence of the jury. None. No taking of names of people. It's just not going to happen. Please have the court staff take direction from the Court. That's it. Thank you. Let's proceed.

> MS. RUIZ: Judge, can I have the name of those two gentlemen in the stand since I am concerned about witness intimidation?

> MS. COYNE: Could I have the names of everybody?

> THE COURT: I have a witness on the stand and a jury in the box. Let's go.
>
> We were just starting to leave the anteroom after considering defense counsel's objection to the comments being made within the hearing of the jurors about witness intimidation.
>
> As we're about to head out the door, Ms. Ruiz, you're still talking about witness intimidation in a loud voice as we're going out when the jury is in the box. Stop putting information before this jury that should not be there.
>
> If there's a concern about anybody in this courtroom acting inappropriately as it relates to anybody, you can bring it to my attention out of the presence of the jury and we'll address it to the extent it's permissible, but you'll stop having those conversations to be overheard in the presence of the jury.

> MS. RUIZ: Judge, I --

THE COURT: Please stop it.

MS. RUIZ: Judge, as you know, as of May of 2005, there has been intimidation of my witnesses that I had to relocate --

THE COURT: Who have you brought charges against?

MS. RUIZ: Because I didn't bring charges --

THE COURT: I'm just asking you the question.

MS. RUIZ: We have not been able to bring charges against anyone.

THE COURT: Then you're not going to continue to say it in the presence of this jury and seek to pollute this jury.

      If there's something going on here that we need to address, we will address it, but it is not appropriate for you to be saying those things to be overheard by this jury.

MS. RUIZ: The door was closed. Second of all, the Court has been aware that the Commonwealth, since May of 2005, has made allegations that witnesses have been intimidated to the point that I had to move a witness out of the jurisdiction.

THE COURT: The Court is aware of that, but Ms. Ruiz, there is a process that is available for prosecuting anybody who seeks to obstruct the trial, interfere with the administration of justice or intimidate witnesses. There are processes.

      But one thing that is not included within that process is the making of statements to be overheard by the jury so as to pollute this trial in progress. That's not part of that process. That's it. Let's go.

N.T. 8/26/05 at 144-48.

      Under Pennsylvania law, "[p]rosecutorial misconduct occurs where the 'unavoidable effect' of the prosecutor's actions is to 'prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing

of the evidence and impede the rendering of a true verdict.'" *Commonwealth v. Graham*, 109 A.3d 733, 736 (Pa. Super. Ct. 2015) (quoting *Commonwealth v. Chmiel*, 777 A.2d 459, 464 (Pa. Super. Ct. 2001).

In this case, defense counsel objected to the prosecutor's request to obtain the names of the people on Yelverton's side of the courtroom but performed deficiently by failing to seek a curative instruction or a mistrial. The prosecutor's actions were clearly improper and served to influence the jury by suggesting that Yelverton and his family were attempting to intimidate witnesses during the course of the trial itself. In light of this explosive allegation, a remedy was warranted, as the prosecutor's conduct served to place evidence that was both inadmissible and outside the record before the jury.

Yelverton suffered prejudice. The prosecutor's behavior created a reasonable probability that Yelverton was convicted based on inadmissible evidence of witness intimidation. Such a belief is not speculation in this case. One of the key issues in the case was why Tyrek Nelson and Christopher Thomas waited four months to discuss the homicide with the police. The defense argued that the men only came forward after incurring criminal charges in other cases; the prosecution argued that the men waited because they feared retaliation. Thus, the prosecutor's improper remarks to court officers served to bolster her argument that Tyrek and Thomas faced threats for testifying and further suggested that Yelverton was attempting to influence their trial testimony. The prosecutor's actions also served to taint the jury and prejudice Yelverton because the prosecutor subsequently introduced a flyer threatening Tyrek Nelson and Christopher

Thomas that was posted in the neighborhood, even though Yelverton could not be connected to the flyer. *See* N.T. 8/29/05 at 48-52.

This claim was not fairly presented in state court. Yelverton can overcome the default under *Martinez* because PCRA counsel rendered ineffective assistance by not bring this substantial claim of trial counsel ineffectiveness. PCRA counsel could not have had a reasonable basis for failing to raise the claim, as witness intimidation was one of the key issues in the case. Further, the claim is substantial. Trial counsel recognized the issue but acted unreasonably by failing to seek a remedy.

**C.    Claim Three:** Trial counsel rendered ineffective assistance by failing to request an updated criminal history record for Tyrek Nelson and to use that criminal history to impeach him at trial.

Prior to trial, Yelverton obtained a criminal history from the Commonwealth regarding Tyrek Nelson. *See* Ex. 5.[5] That history indicated that Tyrek had a prior arrest on August 24, 2004, but did not specify the charges or the disposition of those charges. *See* Ex. 5 (bottom entry). At trial, Tyrek was not asked about the incident or its disposition.

In 2018, the Pennsylvania Superior Court ordered the PCRA court to hold a hearing on Yelverton's second PCRA petition. *Yelverton*, 2018 WL 669285, at *1. Prior to that hearing, Yelverton obtained from the Commonwealth a copy of Tyrek's criminal history. *See* Ex. 6 (showing a preparation date of Oct. 2, 2018). That criminal history and a corresponding court summary reflect that on August 24, 2004, Tyrek was charged with

---

[5] In some court documents, Tyrek Nelson's first name is spelled Tyrik.

five offenses: receiving stolen property, carrying a firearm without a license, carrying a firearm on a public street, possessing a firearm with an altered serial number, and altering the serial number on a firearm. Ex. 6 at 5, Ex. 7 at 3. An August 24, 2004 consent form also shows that Tyrek cooperated with the police at the time of the incident, allowing them to search a car for firearms violations. Ex. 5. The August 24, 2004 offenses were later dismissed on February 7, 2005, less than seven months before Tyrek testified at Yelverton's homicide trial.

Yelverton now contends that trial counsel rendered ineffective assistance by failing to request an updated criminal history and to use that updated history to impeach Tyrek at trial. The updated history would have been admissible at trial because it reflects that Tyrek received favorable treatment from the Commonwealth after the Commonwealth had enlisted him as a witness against Yelverton. Further, the dismissal is relevant to show Tyrek's motive and bias to testify in support of the Commonwealth's case against Yelverton.

In applying *Strickland*'s first prong, trial counsel performed deficiently because Tyrek was the key witness in the case, and counsel had a professional obligation to ensure that she was aware of any criminal charges that Tyrek had incurred during the pendency of Yelverton's case. This is particularly so because counsel had notice that Tyrek had been the subject of an August 24, 2004 arrest.

As for *Strickland*'s second prong, Yelverton suffered prejudice because of Tyrek's role in the case. As Yelverton has argued since his arrest, Tyrek was the key witness in the case against him. Evidence that he received a favorable disposition on a five-count

felony gun case while Yelverton's case was pending would have served to undermine his credibility by demonstrating that he had been rewarded for his cooperation against Yelverton. Further, the dismissal is relevant to show Tyrek's motive and bias to testify helpfully for the Commonwealth.

This claim was not fairly presented in state court. Again, Yelverton can overcome the default under *Martinez*. Initial PCRA counsel had both the ability and the opportunity to obtain a court summary of Tyrek's record and to learn of the dismissed charges. Further, the claim is substantial. Impeachment evidence against Tyrek was critical to Yelverton, and trial counsel acted unreasonably in failing to ensure that she had an updated criminal history.

**D.     Claim Four:** Trial counsel rendered ineffective assistance by failing to object to the admission of hearsay testimony from Theresa Nelson.

During her trial testimony, Theresa Nelson testified that Tyrek told her the day after the offense that Yelverton killed David. N.T. 8/30/05 at 174. By not objecting to this obvious hearsay, trial counsel rendered ineffective assistance. Yelverton raised this claim in his PCRA petition, and the Superior Court determined that counsel performed deficiently, but that Yelverton did not suffer prejudice. The Superior Court offered the following analysis:

> Instantly, the statement at issue was made by Tyrek to Theresa. Appellant had ample opportunity to question Tyrek and attack his credibility both in the Commonwealth's case in chief and on rebuttal. Thus, the jury had the opportunity to assess the declarant's credibility. Moreover, defense counsel was able to use this as an opportunity to question Theresa's credibility. She essentially testified that she knew who her son's murderer was but did not

> tell police for months afterward. Accordingly, we conclude Appellant was not prejudiced by his counsel's failure to object to this hearsay statement, and he is not entitled to relief.

*Yelverton*, 2013 WL 11253450, at *5. For the reasons below, the Superior Court's application of *Strickland* is unreasonable.

First, Yelverton's ability to question Tyrek directly did not counteract the prejudicial effect of Theresa's testimony. Tyrek was the key witness in the case, and evidence that he confided in his mother immediately after the homicide served to bolster the Commonwealth's case. Whether Tyrek was present for the homicide and whom he spoke to following the murder was at the heart of the case. Thus, Theresa's testimony was critical. Second, the Superior Court's prejudice analysis fails to account for the fact that the inadmissible hearsay led to additional inadmissible evidence. Specifically, on cross-examination, defense counsel asked, "I know it might be difficult, ma'am, but isn't it true that Tyrek never told you until months later anything about what happened that night?" N.T. 8/30/05 at 180. Theresa answered, "Well, he called the next day, but we never really, you know, discussed it, went into a lot of details, but he told me who it was, which everybody else in the neighborhood did too." *Id.* at 180-81. Thus, the initial hearsay from Theresa resulted in additional inadmissible testimony that "everybody else in the neighborhood" also implicated Yelverton. Defense counsel failed to object to any of these statements, and none of these purported witnesses testified at trial or implicated Yelverton in the shooting.

Third, Yelverton's ability to attack Theresa's credibility was of little significance. As the mother of a slain victim, she had the jury's sympathy, making it difficult for

27

Yelverton to challenge her testimony. The Superior Court's analysis fails to account for the actual dynamics in the case. Finally, the Superior Court fails to acknowledge that this was a close case. As Yelverton has noted in his arguments in support of relief on his other claims, the jury was torn, and the Commonwealth's case rested on the disputed testimony of two witnesses, physical evidence that did not match the purported eyewitnesses' accounts, and evidence related to a firearm destroyed before trial.

E.    **Claim Five:** Appellate counsel rendered ineffective assistance by failing to appeal the trial court's denial of a mistrial after Christopher Thomas testified that Yelverton had spent 10 years in custody.

At the beginning of Christopher Thomas's testimony, the prosecutor asked Thomas how long he knew Yelverton as of June 10, 2003. N.T. 8/26/05 at 135. Thomas responded, "I didn't know him like that. I know him coming from jail on ten years." *Id.* at 136. Defense counsel objected and sought a mistrial stating, "I believe the jury was prejudiced by the first words out of his mouth that my client was in jail for ten years." *Id.* at 138. The court denied the motion. *Id.* at 139. The trial court then told the jury that Thomas's "last answer will be stricken from the record as non-responsive." *Id.* at 140. Yelverton did not raise the issue on direct appeal. In his PCRA petition, though, Yelverton alleged that appellate counsel rendered ineffective assistance by failing to challenge the trial court's denial of a mistrial. The Superior Court denied relief, providing the explanation below:

> The PCRA court concluded that the statement was "innocuous[.]" PCRA Court Opinion, 11/7/2012, at 6. We agree.

The trial court is in the best position to assess the effect of a prejudicial statement on the jury. Thus, the decision of whether to grant a mistrial is within the sound discretion of the trial court, and will not be reversed on appeal absent an abuse of that discretion. The remedy of a mistrial is an extreme one that is required only when an incident is of such a nature that its unavoidable effect is to deprive the defendant of a fair and impartial trial by preventing the jury from weighing and rendering a true verdict.

*Commonwealth v. Begley*, 780 A.2d 605, 624-25 (Pa. 2001).

"In determining whether a reference to prior criminal activity requires the granting of a new trial, we must analyze each case individually for prejudice." *Commonwealth v. Zook*, 615 A.2d 1, 10 (Pa. 1992). Instantly, we cannot say that Appellant was prejudiced by counsel's failure to raise this issue on direct appeal, as he would not have been entitled to relief. The trial court denied the mistrial, then struck the statement from the record. Such immediate action was sufficient to cure any prejudice to Appellant from this one statement made during the course of a several-day trial. Thus, we conclude that even had counsel raised this issue on direct appeal, this Court would not have granted him relief. Accordingly, he is not entitled to relief now on this basis. *See also Commonwealth v. Zook*, 615 A.2d 1, 10 (Pa. 1992) (reference to defendant's incarceration did not warrant mistrial where statement was neither elicited nor exploited by Commonwealth and jury was not informed of reason for incarceration).

*Yelverton*, 2013 WL 11253450, at *6.

In this case, appellate counsel performed deficiently by failing to raise this preserved claim of trial-court error, and the Superior Court's prejudice analysis is unreasonable.[6] First, this preserved claim of trial-court error was as strong as any of the claims that appellate counsel presented in Yelverton's brief to the Superior Court.

---

[6] A petitioner is entitled to relief on an ineffective-assistance-of-appellate-counsel claim where appellate counsel performs unreasonably and the petitioner is prejudiced as a result. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000).

29

Moreover, Yelverton suffered prejudice from appellate counsel's failure to raise the issue.

In its opinion, the Superior Court agrees with the PCRA court's assessment that Thomas's statement that Yelverton had spent 10 years in custody was "innocuous." This is far-fetched. It is hard to imagine more damaging testimony than the fact that a defendant on trial for murder had recently spent ten years behind bars. Although it is true that trial court struck the statement from the record, that instruction came only after a lengthy sidebar conference drew attention to the statement. Further, the trial court did not provide a curative instruction or tell the jury to disregard the answer; instead the answer was merely "stricken as non-responsive." This left the jury with the implication that the answer was true.

The Superior Court also downplays the prejudice Yelverton suffered because the comment took place during a "several-day trial." This reasoning is also specious. Thomas was one of two purported eyewitnesses in the case, and a witness who knew Yelverton from the neighborhood; his testimony was important. Second, the length of trial did not serve in any way to diminish the prejudice. This was a murder case in which the Commonwealth sought the death penalty. Any implication that Yelverton had a serious criminal record served to undermine his defense. Thus, the Superior Court's analysis here is far too perfunctory to credit; it unreasonably ignores the significance of the Thomas's statement.

**F.    Claim Six:** Yelverton suffered prejudice from the cumulative effect of the trial counsel ineffectiveness claims above and below.

30

Each of the ineffective assistance of trial counsel claims above and below is an independent basis for Yelverton to receive relief in this case. If the Court should find, however, that Yelverton cannot demonstrate prejudice on any single claim, he is nonetheless entitled to relief because the cumulative effect of the errors above resulted in an unfair trial, violating his right to due process. Yelverton did not present a cumulative error claim in state court, but he can overcome the default under *Martinez* for the reasons specified in his discussion of the individual claims above.

## V.      Grounds for relief raised in Yelverton's pro se petition

In 2019, Yelverton filed a pro se habeas petition that raised multiple claims, including most of the claims addressed above. That petition also includes the additional claims below. If appropriate, counsel will address these claims in a counseled reply, following Respondents' response to all of Yelverton's pending habeas claims. In the interest of clarity, Yelverton identifies the pending pro se claims below. The claims, which in some instances are reworded slightly, are renumbered to follow Yelverton's amended claims.

**Claim Seven:** The evidence was constitutionally insufficiently to sustain a conviction for second-degree murder. ECF No. 2 at 5.

**Claim Eight:** Pennsylvania courts entered a decision that was contrary to and an unreasonable application of *Batson v. Kentucky*, 476 U.S. 79 (1986), when it granted the Commonwealth's *Batson*'s motion and rejecting the defense race neutral reasons and sat the juror. ECF No. 2 at 7.

**Claim Nine:** Pennsylvania courts entered a decision that was contrary to or an unreasonable application of clearly established Supreme Court case law and a reading of the facts that were objectively unreasonable when permitting evidence and testimony of

threats and intimidation of Commonwealth's witnesses and showing a flyer depicting them as "rats." ECF No. 2 at 9-10.

**Claim Ten:** Trial counsel rendered ineffective assistance by failing to (a) introduce evidence that David Nelson resided at a location between where he was gambling and where he was shot, (b) introduce Christopher Thomas's initial police statements for impeachment to show that he was lying, (c) call Malik Easley as a witness to show that Tyrek Nelson was not forthcoming regarding threats against him by Petitioner, which would have helped discredit the state's theory of the case, and (d) introduce available evidence to demonstrate that the Commonwealth's key witnesses testified falsely as to motive and the state's theory of the case. ECF No. 2 at 13.

**Claim Eleven:** Trial counsel rendered ineffective assistance by failing to object and preserve for review numerous instances of prosecutorial misconduct, i.e.: (a) after the trial court ruled against the Commonwealth denying the admission and excluding audiotapes the Commonwealth became belligerent, disrespectful, and contemptuous that a very loud and audible argument occurred that was held outside the courtroom which was audible in the jury room and petitioner's holding cell, and (b) failed to correct the falsity of close-range shooting testimony by the Commonwealth's witnesses. ECF No. 2 at 14 (Items 3e and 3f).

**Claim Twelve:** Yelverton's Sixth and Fourteenth Amendments rights were denied based on a conviction obtained with testimony that has been recanted. ECF No. 2 at 16.

**Claim Thirteen:** *Brady* violation. Tyrek Nelson's affidavit reveals that the Commonwealth failed to disclose favorable treatment of Tyrek he had received for implicating Petitioner in the murder, in exchange for dropping charges. ECF No. 2 at 16.

## VI.   Conclusion

For the above reasons, Yelverton asks the Court to recommend that his habeas petition be granted.

Respectfully submitted,

/s/ *Joel Mandelman*
Joel Mandelman
Assistant Federal Defender
Federal Community Defender Office for
the Eastern District of Pennsylvania
601 Walnut Street, Suite 540 West

Philadelphia, PA  19106
(215) 928-1100

*Counsel for Petitioner Kevin Yelverton*

## <u>CERTIFICATE OF SERVICE</u>

I, Joel Mandelman, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that on this date this document has been filed electronically and is available for viewing and downloading from the Court's ECF system. I have served this document electronically upon David Napiorski, Assistant District Attorney, Philadelphia District Attorney's Office.


<u>/s/ *Joel Mandelman*</u>
JOEL MANDELMAN
Assistant Federal Defender

Date: October 4, 2021