IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN YELVERTON,

*Petitioner,*

v.

PATRICIA THOMPSON, et al.,

*Respondents.*

CIVIL ACTION
NO. 19-4796

Pappert, J.                                      February 19, 2025

## MEMORANDUM

Kevin Yelverton was convicted in 2005 by a state court jury of second-degree murder and possession of an instrument of crime.  He was sentenced to life without parole for the former and 16 to 48 consecutive months incarceration on the latter.  He filed a *pro se* petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, advancing eight claims.  Court-appointed counsel subsequently filed a supplemental petition, adding five new claims.  Magistrate Judge Sitarski issued a Report and Recommendation recommending denial of all thirteen claims.  Yelverton objected to Judge Sitarski's analysis for seven of the thirteen claims.  After thoroughly reviewing the record, the Court overrules the objections and adopts the R&R in its entirety.

I

A

The events that led to Yelverton's arrest were comprehensively summarized by the Superior Court during direct appeal proceedings:

> On June 9, 2003[,] at approximately 6:30 p.m., Tyrek Nelson (hereinafter "Tyrek"), David Nelson, his brother, the deceased (hereinafter "David"),

and Michael Hinton . . . were on Conestoga Street in Philadelphia. [Appellant] (a/k/a Gotti) approached David and questioned him about something that was stolen from [Appellant's] apartment. An argument ensued, [Appellant] grabbed David by his shirt, and they began shoving each other. Michael intervened and broke up the altercation. Tyrek, David, and Michael left the area and walked over to 55th Street in Philadelphia.

The next day, June 10, 2003[,] at approximately 9:00 p.m., Tyrek and other unknown males were in a dice game on Conestoga Street between Poplar Street and Girard Avenue in Philadelphia. David joined the dice game and won about twelve hundred dollars before he left. Approximately twenty minutes after David left the dice game, Tyrek left and walked towards 54th and Pennsgrove Streets. When he was approximately 60 feet away from Pennsgrove Street, he heard a gunshot. Upon turning onto Pennsgrove Street, he saw a male with braids, later identified as [Appellant], standing over another male, later identified as David, who was on the ground. He saw [Appellant] touch David's clothing and shoot at him twice. After firing the shots, [Appellant] ran across 54th Street through a parking lot.

*Commonwealth v. Yelverton*, 221 A.3d 1231 (Pa. Super. Ct. 2007) (quoting trial court

post-conviction opinion dated July 14, 2006).[1]

### B

Yelverton was arrested on November 25, 2003 and charged with first- and

second-degree murder and possessing an instrument of a crime, and was tried in the

Philadelphia County Court of Common Pleas.  The evidence presented against

Yelverton was summarized by the Superior Court as follows:

At trial, the Commonwealth presented testimony of numerous witnesses, including the medical examiner; the detectives who participated in the investigation; Christopher Thomas (Christopher); Tyrek; and, Theresa Nelson (Theresa), the mother of both David and Tyrek.  The defense presented testimony of Nakeata Hale and Michael [Hinton].

Christopher testified that he knew Appellant "coming from jail on ten years."  N.T., 8/26/2005, at 135.  He also testified that Appellant killed David.  *Id.* at 159.  Specifically, Christopher saw Appellant fire two shots

---

[1]    Because David Nelson, Tyrek Nelson and Theresa Nelson all share the same last name, the Court will mirror the Superior Court's practice of referring to them as David, Tyrek and Theresa.

while standing over David. *Id.* at 160. He also testified that he saw Tyrek running to the scene. *Id.* at 171. There is no dispute that Christopher did not tell police about what he saw until October 4, 2003. *Id.* at 176.

The Commonwealth also called Tyrek to testify. Tyrek testified that after he heard gunshots and went running toward the scene, he saw Appellant standing over someone who was lying on the ground. N.T., 8/29/2005, at 40. He testified that he saw Appellant shoot the person two times, and later learned that it was his brother, David, who was on the ground. *Id.* at 41.

On September 28, 2003, police tried to pull Tyrek over after he committed a traffic violation. Tyrek ignored the police and got into an accident while trying to avoid the police. Tyrek testified that he was trying to avoid the police "[b]ecause [he] knew they wanted [him] to come down because [he] knew what happened to [his] brother." *Id.* at 48. Tyrek told police what he knew about his brother's murder at that point. *Id.* at 59.

Theresa also testified on behalf of the Commonwealth. She stated that on the evening of June 10, 2003, she got a phone call that something had happened to David. She went to the hospital where she found out he had died. The next morning, she spoke to Tyrek, who told her that Appellant shot David. N.T., 8/30/2005, at 174. On cross examination, Theresa admitted telling police shortly afterward that she did not believe that Tyrek had seen the shooting because "Ty would not have just stood there while David got shot." *Id.* at 179. Theresa stated that she and Tyrek did not discuss the shooting until months afterward, other than his telling her that Appellant shot David. *Id.* at 180-181.

Defense counsel's strategy was to discredit the testimony of all of these witnesses, particularly Tyrek. In her opening statement, counsel stated that the Commonwealth's entire case "boils down to the credibility of one person, Tyrek Nelson, the younger brother of the decedent, David Nelson." N.T., 8/25/2005, at 216. Specifically, counsel wanted the jury to consider the fact that Tyrek did not tell police that Appellant was the murderer until 110 days after the incident. *Id.* at 217. Furthermore, counsel argued that the only reason Tyrek eventually gave police Appellant's name was because Tyrek himself was in trouble with police; therefore, "[he] made up a story to benefit himself because he got into trouble." *Id.* at 218. The Commonwealth sought to show the jury that the reason Tyrek did not come forward sooner was because he feared retaliation.

*Commonwealth v. Yelverton*, 2013 WL 11253450, at *1-2 (Pa. Super. Ct. Oct. 25, 2013).

The Commonwealth also called several police officers, including Michael

Ditizio, who testified that on July 22, 2003, he encountered Yelverton, who possessed a

3

handgun, and engaged in a foot chase during which Yelverton threw the gun away. (Aug. 26, 2005 Tr. at 69-78.)  Yelverton was apprehended and the gun recovered.  (*Id.*) Officer Robert Stott testified that he examined the firearm on July 25, 2003 and determined that it was a "Heckler & Koch, Model USP, 45 caliber automatic" handgun with black finish.  (*Id.* at 118:8-18.)  Officer John Finor conducted a ballistics analysis and concluded that a "fired cartridge that was recovered" at the location of David's murder matched the cartridge test-fired from the pistol by the police.  (Aug. 30, 2005 Tr. at 89:9-24.)  In other words, he concluded that the fired cartridge found at the crime scene "was, in fact, fired in this pistol." (*Id.*)[2]

On September 12, 2005, a jury found Yelverton not guilty of first-degree murder but guilty of second-degree murder and possession of an instrument of crime.  On October 24, 2005, Yelverton was sentenced to life without parole on the murder conviction and a consecutive term of 15-to-48 months incarceration for possessing an instrument of crime.  On August 30, 2007, the Superior Court affirmed his conviction and sentence, and the Pennsylvania Supreme Court denied allocatur.  *Commonwealth v. Yelverton*, 935 A.2d 27 (Pa. Super. Ct. 2007), *appeal denied*, 946 A.2d 688 (Pa. 2008).

C

On December 1, 2008, Yelverton filed his first state post-conviction relief petition under the Pennsylvania Post-Conviction Relief Act.  *See generally* (First PCRA Pet.).

---

[2]    The police also found several bullet jackets that were determined to be from a .38/.357 class firearm, likely a revolver.  (Aug. 30, 2005 Tr. at 75:24-76:4; 81:14-19.)  David's body was found with an empty holster designed for a revolver.  (Aug. 26, 2005 Tr. at 35:12-16); (Aug. 30 Tr. at 86:13-17.) Michael Hinton testified that David owned a .357 revolver, which was never recovered.  (Aug. 29, 2005 Tr. at 46:3-4); (Aug. 31, 2005 Tr. at 35:2-4.)  The Commonwealth used this evidence to argue that Yelverton committed the homicide with both the .45 and the .357, which he took off David. (Sept. 7, 2005 Tr. at 76:4-19.)

On January 18, 2011, Yelverton's petition was denied without a hearing.  (Docket Sheet, *Commonwealth v. Yelverton*, CP-51-CR-0104401-2004, at 14.)  He timely appealed the PCRA court's denial of the following three claims: (1) ineffective assistance of trial counsel for failing to call Malik Easley as a witness to impeach Tyrek's testimony, (2) ineffective assistance of appellate counsel for failure to appeal the trial court's denial of a mistrial motion based on a witness's reference to Yelverton's prior time in prison, and (3) ineffective assistance of trial counsel for failure to object to Theresa's hearsay statement that Tyrek identified him as the killer.  (Yelverton First PCRA Brief, Pa. Super. Ct., at 11, 14, 16.)  On October 25, 2013, the Superior Court affirmed the denial of Yelverton's petition, and on April 8, 2014, the Pennsylvania Supreme Court denied allocatur. *Commonwealth v. Yelverton*, 2013 WL 11253450 (Pa. Super. Ct. Oct. 25, 2013), *appeal denied*, 89 A.3d 661 (Pa. 2014).

## D

On June 6, 2014, Yelverton filed a second PCRA petition alleging that he had obtained new evidence undermining his conviction and entitling him to post-conviction relief.  *See generally* (Second PCRA Pet.).  Specifically, he attached an affidavit in which Tyrek stated he "knew when David Nelson was killed that Kevin Yelverton did not do it" and that the "Detectives knew I was'nt [sic] telling the truth and they were offering to drop charges against me if I told them what [they] wanted to hear."  On August 1, 2016, the PCRA court denied Yelverton's petition as untimely.  (Aug. 1, 2016 Order, Second PCRA Pet.)  The Superior Court remanded, holding the PCRA court did not adequately explain why the newly discovered evidence exception to the PCRA statute of

limitations did not apply. *Commonwealth v. Yelverton*, 2018 WL 669285, at *4-5 (Pa. Super. Ct. Feb. 2, 2018).

On remand, the PCRA court held an evidentiary hearing on Yelverton's claim. *See generally* (Oct. 5, 2018 PCRA H'rg Tr). The PCRA court found Tyrek's recantation incredible because, *inter alia*, "[Tyrek] gave consistent statements throughout the entirety of the case," "[i]t took ten years, five of which he was incarcerated, to recant his story," "[t]o [Tyrek]'s own admission, it is problematic to be known as a snitch in jail," "it is not credible that police would know all the detailed information in [Tyrek]'s statement," and "[t]here was no evidence presented to show that [Tyrek] gave the statement in exchange for the police dropping charges." (Second PCRA Op., at 4-5.) The PCRA court further held that, even if Tyrek's testimony were credible, his recantation alone would not suffice to grant a new trial because there was still sufficient evidence of Yelverton's guilt. (*Id.*) The PCRA court denied Yelverton's second petition accordingly. (*Id.*) On September 6, 2019, the Superior Court affirmed the PCRA court's decision, and the Pennsylvania Supreme Court denied allocatur. *Commonwealth v. Yelverton*, 2019 WL 4233887 (Pa. Super. Ct. Sept. 6, 2019), *appeal denied*, 223 A.3d 1285 (Pa. 2020).

On March 2, 2020, Yelverton filed a third PCRA petition, claiming trial counsel was constitutionally ineffective for failing to impeach Tyrek with evidence of an August 2004 arrest. (Third PCRA Pet., ECF No. 63-1.) On July 15, 2020, the PCRA court denied this petition as untimely and Yelverton did not appeal.

E

On October 16, 2019, Yelverton filed this petition under 28 U.S.C. § 2254, asserting eight claims. (ECF No. 2.) The Court, *sua sponte*, appointed the Federal Community Defender Office in April 2020 to represent Yelverton. (ECF No. 14.) Yelverton, through counsel, filed a supplemental petition in October of 2021, incorporating the claims raised in the *pro se* petition and adding five new ones. (ECF No. 33.)[3] All together, he makes the following claims:

(1) Trial counsel rendered ineffective assistance by failing to move to exclude evidence of a .45 caliber weapon and shell casings as a matter of state and federal due process;

(2) Trial counsel rendered ineffective assistance by failing to seek a mistrial or curative instruction after the prosecutor raised issues related to witness intimidation in front of the jury;

(3) Trial counsel rendered ineffective assistance by failing to request Tyrek's updated criminal history record for use in impeaching his testimony;

(4) Trial counsel rendered ineffective assistance by failing to object to the admission of a hearsay statement;

(5) Appellate counsel rendered ineffective assistance by failing to appeal the trial court's denial of a mistrial after Christopher Thomas testified that Yelverton had spent time in jail;

(6) Yelverton suffered prejudice from the cumulative effect of the trial counsel ineffectiveness claims;

---

[3]    Under 28 U.S.C. § 2242, a *habeas* petition may "be amended or supplemented as provided in" Federal Rule of Civil Procedure 15. Rule 15 requires courts to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Generally, an amended petition "supersedes and renders moot" the initial petition. *Graziano v. Grace*, No. 05-2300, 2008 WL 1902191, at *5 n.6 (E.D. Pa. Apr. 29, 2008). An exception applies, however, when the amended petition "specifically refers to or adopts the earlier" petition. *Lazar v. Town of W. Sadsbury*, No. 20-cv-5336, 2021 WL 2472253, at *4 n.5 (E.D. Pa. June 17, 2021) (quoting *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013)). This rule "ensures that a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990).

Here, Yelverton's supplemental petition expressly incorporated the claims in the *pro se* petition. (Supp. Pet. at 1, ECF No. 33) (seeking *habeas* relief "based on the grounds below and those set out in his *pro se habeas* petition"). The Court thus addresses all thirteen claims.

(7) The evidence was constitutionally insufficient to sustain a conviction for second-degree murder;

(8) The trial court erred in granting the Commonwealth's *Batson* motion during jury selection;

(9) The trial court erred by permitting evidence of threats and intimidation of the Commonwealth's witnesses;

(10) Trial counsel rendered ineffective assistance by failing to (a) introduce evidence that David Nelson resided at a location between where he was gambling and where he was shot, (b) introduce Christopher Thomas's prior inconsistent statement, (c) call Malik Easley as a witness to impeach Tyrek, and (d) introduce evidence showing that the Commonwealth's key witnesses testified falsely;

(11) Trial counsel rendered ineffective assistance by failing to object to purported prosecutorial misconduct;

(12) Yelverton's conviction was obtained with testimony that has been recanted; and

(13) The Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963) when it failed to disclose that criminal charges against Tyrek were dropped in exchange for his testimony.

The Commonwealth responded on November 29, 2022, and Yelverton filed a reply on May 11, 2023. (ECF Nos. 52, 63.) On May 7, 2024, Magistrate Judge Sitarski issued her R&R recommending that all thirteen claims be denied. (ECF No. 69.) Yelverton objected to Judge Sitarski's conclusions as to claims (1−6) and (10)(c), but not as to claims (7), (8), (9), (10)(a), (10)(b), (10)(d), (11), (12) or (13). (ECF No. 73.)[4]

---

[4]    The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The Court reviews *de novo* the specific portions of the R&R to which a party objects. 28 U.S.C. § 636(b)(1); *see also Cont'l Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 250 (3d Cir. 1998). For portions of the R&R to which no objection is made, "a district court is not required to determine *de novo* whether a magistrate judge erred" in denying such claims. *Medina v. DiGuglielmo*, 461 F.3d 417, 426 (3d Cir. 2006) (citing Fed. R. Gov. § 2254 Cases 8(b)). However, as a matter of good practice, courts generally review unobjected-to claims for clear error. *See, e.g.*, *Harris v. Mahally*, No. 14-2879, 2016 WL 4440337, at *4 (E.D. Pa. Aug. 22, 2016).

## II

## A

28 U.S.C. § 2254 bars the Court from granting *habeas* relief on any claim that a state court has already adjudicated on the merits unless the state court's decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Clearly established" federal law consists only of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Andrew v. White*, No. 23-6573, 604 U.S. ----, slip op. at 5 (Jan. 21, 2025) (per curium) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). A legal principle upon which the Supreme Court relies to decide a case is a "holding" for AEDPA purposes. *Id.* at 6.

The "contrary to" clause permits a court to grant the writ if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The "unreasonable application" clause permits a court to grant the writ if "the state

---

Judge Sitarski concluded there were insufficient facts alleged to address claims (7), (8), (9), (10)(a), (10)(b), (10)(d), (11), (12) and (13). Yelverton listed these claims in his supplemental petition without conducting any analysis, saying "if appropriate, counsel will address these claims in a counseled reply, following Respondents' response." (Supp. Pet. at 31.) After the Commonwealth filed its response to each claim, however, Yelverton did not address these claims.

After reviewing the record and the R&R, the Court perceives no clear error in Judge Sitarski's conclusions regarding these claims. Neither of Yelverton's petitions allege enough facts or law to allow the Court to pass on them. *See Anderson v. Pa. AG*, 82 Fed. App'x 745, 749 (3d Cir. 2003) ("[V]ague and conclusory grounds for *habeas* relief are subject to summary dismissal."); Rule 2(c) of the Rules Governing Section 2254 Cases (providing that *habeas* petitions shall set forth "all the grounds for relief available to the petitioner" and "state the facts supporting each grounds").

court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Whether a state court's application of federal law is "unreasonable" is judged objectively. *Id.* at 409–10. "[A]n application may be incorrect but still not unreasonable," *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001), so a petitioner must show that the state court's error is "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013). But a federal *habeas* court generally must also review the state court's opinion on its own terms and "may not speculate as to theories that 'could have supported' the state court's decision.*" Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 283 (3d Cir. 2016) (en banc).[5] Finally, a decision is not based on an unreasonable determination of facts "merely because the federal *habeas* court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quotations omitted).

If a federal *habeas* court determines that a petitioner meets one of § 2254(d)'s exceptions, the court "must then resolve the claim without the deference [28 U.S.C. § 2254(d)] otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

B

Before a federal court can grant a petition for a writ of *habeas* corpus, the petitioner must exhaust the remedies available in state court. *Lambert v. United States*, 134 F.3d 506, 513 (3d Cir. 1997) (citing 28 U.S.C. § 2254(b)(1)(A)). To satisfy

---

[5]    Only when the federal court "cannot be sure of the precise basis for the state court's ruling" may the federal court "gap fill[]" and speculate about reasonable theories. *Dennis*, 834 F.3d at 283.

this exhaustion requirement, a federal *habeas* petitioner must demonstrate that the claims at issue have been "fairly presented to the state courts." *Castille v. Peoples*, 489 U.S. 346, 351 (1989). This requirement is satisfied by "invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Where a claim is not properly presented to the state courts, the petitioner has procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Such a claim cannot provide a basis for federal *habeas* relief unless the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or [unless he] demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." *See Wainwright v. Sykes*, 433 U.S. 72 (1976); *Coleman*, 501 U.S. at 750. The "fundamental miscarriage of justice" exception ordinarily requires a showing of "actual innocence." *See Leyva v. Williams*, 504 F.3d 357, 366 (3d Cir. 2007).

## C

To succeed on a claim for ineffective assistance of counsel, a petitioner must show that (1) his "counsel's performance was deficient," and (2) he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both prongs are "mixed questions of law and fact." *Id.* at 698.

Counsel's performance is deficient when it falls "below an objective standard of reasonableness." *Id.* at 687–88. Courts apply a "strong presumption" of reasonableness and should endeavor "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." *Id.* at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. And when "the record does not explicitly disclose trial counsel's actual strategy or lack thereof (either due to lack of diligence on the part of the petitioner or due to the unavailability of counsel), the presumption [of reasonableness] may only be rebutted through a showing that no sound strategy . . . could have supported the conduct." *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005). In cases where a state court has already passed on the merits of an ineffective-assistance claim, the federal *habeas* court's review is "doubly" deferential, so as "to afford both the state court and the defense attorney the benefit of the doubt." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotations omitted).

To establish prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). To determine the likelihood of a different outcome, the Court "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Counsel cannot be found to be ineffective for failing to pursue a meritless claim. *See United States v. Bui*, 795 F.3d 363, 366–67 (3d Cir. 2015).

III

Claims (4), (5) and (10)(c) were timely presented to the state courts in Yelverton's first PCRA petition. Each claim alleges that the Superior Court decision

was an unreasonable application of *Strickland*, but Yelverton has not met his burden of showing that the Superior Court erred beyond any possibility for fairminded disagreement.

### A

Yelverton claims his trial counsel was ineffective for failing to object to a hearsay statement from Theresa, the decedent's mother.  (Supp. Pet. at 26, ECF No. 33.)  During her direct examination, Theresa testified that the day after the shooting, Tyrek told her that Yelverton was the one who killed David.  (Aug. 30, 2005 Tr. at 174:4-10.)[6]  The Superior Court agreed with Yelverton that the statement was "clearly hearsay," but held that he was not prejudiced by counsel's failure to object.  *Yelverton*, 2013 WL 11253450, at *5.  The court reasoned that the usual concerns underlying the rule against hearsay were not present because Tyrek also testified that he told Theresa that "Gotti" (a.k.a. Yelverton) was the shooter, and Yelverton's counsel had the opportunity to cross-examine him.  (Aug. 29, 2005 Tr. at 121-124.)

Trial counsel may be constitutionally ineffective for failing to "make a crucial objection" if the record shows that the failure was due to counsel's unfamiliarity "with clearly settled legal principles."  *Thomas v. Varner*, 428 F.3d 491, 501 (3d Cir. 2005).  "The defendant is most likely to establish incompetency where counsel's alleged errors of omission or commission are attributable to a lack of diligence rather than an exercise

---

[6]    Yelverton points to another purported hearsay statement: when Theresa testified that "everybody else in the neighborhood" also told her that Yelverton was the shooter.  (Aug. 30, 2005 Tr. at 180:23-181:2.)  Yelverton never discussed this statement in the PCRA proceedings so no state court has ever had the opportunity to weigh the merits of this claim or its likelihood of success.  Any ineffective assistance claim for failure to object to this statement is procedurally defaulted and Yelverton fails to demonstrate cause and prejudice for the default.

And on the merits, this statement, even if hearsay, is alone insufficient to create a reasonably probability of a different outcome.

of judgment." *Id.* (citation omitted). Here, Yelverton has failed to establish that no sound strategy could have supported counsel's decision not to object. Again, the day before Theresa's testimony, Tyrek testified he told Theresa that Yelverton committed the murder. (Aug. 29, 2005 Tr. at 121-124.) Instead of objecting when Theresa corroborated Tyrek's account, counsel chose to impeach Theresa's testimony with her prior inconsistent statement to police that Tyrek did not tell her who killed David. (Aug. 30, 2005 Tr. at 178-179.) There is nothing in the record to rebut the reasonableness of this decision. *See generally Diaz v. Oberlander*, 2023 WL 1994389, at *10 (M.D. Pa. Feb. 14, 2023) (noting that "trial counsel had a rational, strategic basis for not objecting to the hearsay testimony," so "Petitioner fails on the first prong of the *Strickland* analysis").

Even if counsel's performance was deficient, the Superior Court correctly determined that Yelverton suffered no prejudice from counsel's decision not to object. Given the totality of the evidence before the jury, including Tyrek's testimony that he identified Yelverton as the shooter to Theresa, Yelverton fails to demonstrate that there is a reasonable probability that the outcome might have been different had counsel objected.[7] Yelverton claims, as he does elsewhere in his objections, that the prejudicial impact of the hearsay statement is magnified by what he characterizes as the overall weakness of the evidence against him. (Obj. to R&R at 4.) The state courts held that

---

[7]    Yelverton contends the prejudicial impact of Theresa's hearsay statement is unaffected by trial counsel's impeachment of Theresa because the government rehabilitated her credibility with evidence of witness intimidation. (Obj. to R&R at 3, ECF No. 73); (Aug. 30, 2005 Tr. at 173-76.) The Commonwealth's attempt to explain Theresa's inconsistency with evidence of witness intimidation is not sufficient to create a reasonable probability the outcome of the trial would have been different. And even if it did, the evidence of witness intimidation does not affect the contemporaneous reasonableness of counsel's decision not to object to Theresa's statement.

the evidence "[c]learly . . . supports the jury finding the defendant guilty" and that the guilty verdict was "firmly based upon the evidence." *Yelverton*, 935 A.2d 27 (2007) (adopting trial court reasoning in affirming its decision).  Yelverton fails to rebut the reasonableness of this state court decision, so the Court will not characterize the evidence any other way.

B

Yelverton next claims that his appellate counsel was ineffective for failing to appeal the denial of his trial counsel's motion for a mistrial.  (Supp. Pet. at 28.)  When the prosecutor asked Christopher Thomas how long he knew Yelverton, Thomas replied "I didn't know him like that.  I know him coming from jail on ten years."  (Aug. 26, 2005 Tr. Transcript at 135:21-136:2.)  Defense counsel moved for a mistrial because the witness told the jury Yelverton had previously served time in prison.  (*Id.* at 138:20-24.)  The trial court denied the motion but struck the comment from the record as non-responsive.  (*Id.* at 139:2-10.)  Yelverton believes appellate counsel should have appealed that ruling.  The Superior Court denied the claim, reasoning there was no prejudice from the remark because it was a stray comment during a several-day trial and it was stricken from the record.  *Yelverton*, 2013 WL 11253450, at *6.

"[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000); *see also Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.").  In Pennsylvania, "[a] mistrial is an extreme remedy [that] must

15

be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial." *Commonwealth v. Bracey*, 831 A.2d 678, 682 (Pa. Super. Ct. 2003). "The decision whether to declare a mistrial is within the sound discretion of the trial judge and will not be reversed absent a flagrant abuse of discretion." *Commonwealth v. Cottam*, 616 A.2d 988, 997 (Pa. Super. Ct. 1992).

Here, appellate counsel was reasonable in choosing to pursue other claims on appeal because a challenge to the denial of the mistrial motion would have likely failed. It is well-settled in Pennsylvania that a "singular, passing reference to a prior conviction is simply not sufficient to show that the trial court abused its discretion in denying [a] motion for a mistrial." *Commonwealth v. Kerrigan*, 920 A.2d 190, 200 (Pa. Super. Ct. 2007); *see also, e.g.*, *Commonwealth v. Richardson*, 437 A.2d 1162, 1165 (Pa. 1981) ("The nature of the reference and whether the remark was intentionally elicited by the Commonwealth are considerations relevant to the determination of whether a mistrial is required."); *Commonwealth v. Guilford*, 861 A.2d 365, 370–71 (Pa. Super. Ct. 2004) (finding no trial court error in denying a mistrial where there were two passing references to the defendant's prior convictions); *Commonwealth v. Washington*, 285 A.3d 946, 2022 WL 4373308, at *6 (Pa. Super. Ct. 2022) ("The court noted that the statement was brief, it did not refer to the commission of a any specific crime or a conviction, and it was not exploited by the Commonwealth."). Thomas's remark was a singular, passing reference to prior prison time, it was not elicited by the prosecutor, and it did not refer to a specific crime or conviction.[8]

---

[8]    Yelverton attempts to counter this case law by citing two cases. First, *Commonwealth v. Vazquez*, 617 A.2d 786 (Pa. Super. Ct. 1992), in which the PCRA court held the trial court erred in denying a mistrial after the prosecution's witness called the defendant a known drug dealer. But *Vazquez* is inapposite here, as in that case, the defendant was on trial for drug offenses, so the

Even if appellate counsel's performance was deficient, the Superior Court's finding that there was no prejudice from the remark was not an unreasonable application of *Strickland*. Thomas's comment was at the beginning of trial, it was immediately stricken from the record, and it was not exploited by the prosecution. This is insufficient to create a reasonable probability that, but for the stray remark, the outcome of the trial would have been different.

C

Yelverton's final exhausted claim is that trial counsel was constitutionally ineffective for failing to call Malik Easley as a witness. According to Tyrek's testimony, Easley was a friend of both Tyrek and Yelverton who, three weeks after David Nelson's murder, facilitated a phone call between Yelverton and Tyrek in which Yelverton warned Tyrek "you know what happens, you know how things go down, this is the streets, keep it on the streets." (Aug. 29, 2005 Tr. at 55:16-19.) This statement was introduced as part of the Commonwealth's strategy to explain why Tyrek waited several months to come forward with his eyewitness account. Yelverton believes counsel was ineffective for failing to call Easley as a witness, and cites an affidavit he attached to his first PCRA petition in which Easley avers "I have no knowledge of Kevin Yelverton killing David Nelson and confessing such over the phone with Tyrek

---

witness's comment was highly prejudicial. Here, Thomas's comment does not specifically identify the crime Yelverton was previously convicted of.

Next, Yelverton relies on *Commonwealth v. Rivers*, 357 A.2d 553 (Pa. Super. Ct. 1976), in which the PCRA court held the trial court erred in denying a mistrial after a witness made a comment similar to Thomas's. But the Superior Court has since noted that *Rivers* is part of a separate line of case law that it folded into the prevailing rule. *Commonwealth v. Gaerttner*, 484 A.2d 92, 106 (Pa. Super. Ct. 1984). In other words, though mention of a prior criminal conviction in a witness's testimony is prejudicial, a mistrial is not necessary where the prosecutor does not intentionally elicit the testimony, i.e., whether the answer is responsive to the question asked. *Id.*

17

Nelson," and "I never spoke with [Tyrek] over the phone and then passed the phone to [Yelverton] while Tyrek Nelson was on the phone." (Oct. 23, 2008 Easley Affidavit.)

An attorney's decision not to call a witness is "precisely that type of strategic decision which the court in *Strickland* held to be protected from second-guessing." *Dunlavey v. Court of Common Pleas*, No. 02–3734, 2004 WL 1563012, at *15 (E.D. Pa. July 13, 2004) (quoting *Sanders v. Trickey*, 875 F.2d 205, 212 (8th Cir. 1989)). A petitioner must overcome a "strong presumption that counsel's decision not to call [a witness] was the result of sound trial strategy." *Reinert v. Larkins*, 211 F. Supp. 2d 589, 599 (E.D. Pa. 2002); *see also Hess v. Mazurkiewicz*, 135 F.3d 905, 908–09 (3d Cir. 1998); *Klein v. Kaufmann*, No. 15-0065, 2019 WL 1285474, at *17-20 (E.D. Pa. Mar. 20, 2019).

The Superior Court ruled against the ineffectiveness claim due to lack of prejudice, basing its decision on two findings.[9] First, Easley's affidavit misstated the record by denying that he spoke with Tyrek over the phone and then passed the phone to Yelverton. (Oct. 23, 2008 Easley Affidavit.) Easley got this backwards—Tyrek testified that Easley was on the phone with *Yelverton* and then handed the phone to

---

[9]    The Superior Court relied on a five-element test Pennsylvania courts apply to ineffectiveness claims based on failure to call a witness. That test requires a petitioner to prove:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Washington*, 927 A.2d 586, 599 (Pa. 2007).

The Third Circuit has held, however, that "whether a witness is ready and willing to testify is irrelevant since defense counsel can compel testimony through a trial subpoena." *Grant v. Lockett*, 709 F.3d 224, 239 n.10 (3d Cir. 2013). Even so, the state test still clarifies that it is the petitioner's "burden to demonstrate that trial counsel had no reasonable basis for declining to call [] a witness." *Washington*, 927 A.2d at 599.

*Tyrek.* (Aug. 29, 2005 Tr. at 54:14-17.) Easley also denied in the affidavit that Yelverton ever confessed to the murder on the call. (Oct. 23, 2008 Easley Affidavit.) But Tyrek did not testify that Yelverton confessed on the phone call. The Superior Court was correct to note that these discrepancies made it difficult to determine whether Easley "would have testified to anything that would have been helpful" to Yelverton. *Yelverton*, 2013 WL 11253450, at *4.

Second, the Superior Court held there was no prejudice due to counsel's cross-examination of Tyrek on his account of the phone call. *Id.* Specifically, counsel impeached Tyrek with his earlier statement that Yelverton had called him on *his* cellphone, not Easley's. (Aug. 29, 2005 Tr. at 124-25.) Tyrek responded that that statement was in reference to a "whole different conversation" with Yelverton. (*Id.*) Counsel's cross-examination undermined Tyrek's earlier statements that he was "never contacted directly by the defendant," that Yelverton "never called [him] on [his] cell phone," and that his conversation with Yelverton on Easley's phone was his only contact with Yelverton. (Aug. 29, 2005 Tr. at 54-56.)

Counsel's decision to impeach Tyrek's credibility with an earlier statement rather than calling an impeachment witness was reasonable. *See Richburg v. Superintendent Houtzdale SCI*, No. 19-1768, 2022 WL 218758, at *3 (3d Cir. 2022) (holding counsel was reasonable for not calling an impeachment witness because the prosecution's witness "was cross-examined on this subject, and therefore, the jury had the opportunity to weigh the impact of her statements on her credibility"). Indeed, Easley would have been subject to cross-examination, introducing risks not present in focusing instead on a prior inconsistent statement. Further, the Superior Court

correctly determined that counsel's cross examination minimized any prejudice from not calling Easley as a witness. The lack of prejudice is underscored by the fact that there was other evidence that Yelverton intimidated Tyrek into not going to the police; Theresa had testified that Michael Hinton called her from jail and complained that "he was being beat up all the time by [Yelverton] and harassed by [Yelverton] and his friends." (Aug. 31, 2005 Tr. at 102:3-6.)

IV

Claims (1), (2), (3) and (6) are all based on ineffective assistance of counsel, but these claims were not properly presented to the state courts and are procedurally defaulted.[10] Yelverton unsuccessfully relies on *Martinez v. Ryan*, 566 U.S. 1 (2012) to excuse his default on each claim.

A

In *Martinez*, the Supreme Court held that post-conviction counsel's failure to raise an ineffective assistance of counsel claim on collateral review may constitute "cause" to excuse procedural default of that claim if: (1) the underlying ineffective assistance of trial counsel claim is "substantial," (2) the procedural default of that substantial claim was the result of state post-conviction counsel's ineffectiveness, and (3) the state requires a defendant to bring the claim in state post-conviction proceedings

---

[10]    The PCRA sets a one-year statute of limitations for petitions, which courts have uniformly regarded as an adequate and independent state procedural rule. *See, e.g.*, *Moffatt v. Overlander*, No. 21-cv-293, 2023 WL 9321094, at *5 (W.D. Pa. Dec. 11, 2023) (collecting cases). Thus, a state court's determination that a PCRA petitioner failed to satisfy the statute of limitations renders the claim procedurally defaulted on federal review.

    Here, Yelverton raised claims (1), (2) and (6) in his second PCRA petition, but the PCRA court denied these claims as untimely. The Superior Court remanded so that the trial court could hold a hearing on a separate due process claim based on Tyrek's recantation, but it left the denial of claims one, two and six unaffected. *Yelverton*, 2018 WL 669285, at *4-5. Yelverton raised claim (3) in his third PCRA petition, which the PCRA court again denied as untimely.

rather than on direct appeal.  566 U.S. 1, 14 (2012).  "[S]ubstantial" means that the claim has "some merit," meaning that "reasonable jurists could debate whether (or, for that matter agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).

If a federal *habeas* court holds a hearing on whether a petitioner can overcome the default of a *Martinez* claim, it may not consider evidence introduced at that hearing in evaluating the merits of the underlying *habeas* claim unless the petitioner satisfies one of 28 U.S.C. § 2254(e)(2)'s two exceptions to the general bar on evidentiary hearings.  *Shinn v. Ramirez*, 596 U.S. 366 (2022) ("[W]hen a federal *habeas* court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied.").

In other words, courts cannot hold an evidentiary hearing to develop evidence supporting the merits of a petitioner's claims unless they are based on (1) a "new" and "previously unavailable" rule of constitutional law made retroactively applicable, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence."  *Id.* at 381–82 (citing 28 U.S.C. §§ 2254(e)(2)(A)(i), (ii)) (adding that "state postconviction counsel's ineffective assistance in developing the state-court record" is "attributed to the prisoner").  "If a prisoner can satisfy either of these exceptions, he also must show that further factfinding would demonstrate, 'by clear and

convincing evidence,' that 'no reasonable factfinder' would have convicted him of the crime charged." *Id.* at 381 (quoting 28 U.S.C. § 2254(e)(2)(B)).

In *Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713 (3d Cir. 2022), the Third Circuit, applying *Shinn*, instructed that before holding a hearing on whether a petitioner can overcome a default of a *Martinez* claim, a federal *habeas* court must first decide whether the underlying defaulted *habeas* claim "succeeds considering only the state court record." *Id.* at 724. If the court concludes that the underlying claim is not supported by the state court record, it "should deny relief without more." *Id.* at 723–24.

## B

Yelverton contends trial counsel was ineffective for not moving to exclude the testimony and accompanying ballistics report of Officers Stott and Finor, in which they matched the .45 caliber firearm found on Yelverton the month after the murder to the cartridge casing found at the crime scene. Yelverton argues that the Commonwealth's unexplained destruction of the firearm before trial violated the Due Process Clause. (Supp. Pet. at 16-17.) He cites *Commonwealth v. Deans*, 610 A.2d 32 (Pa. 1992), in which the Pennsylvania Supreme Court held prosecutors may not introduce an expert report or testimony about "primary evidence" that they lost or destroyed before trial. *Id.* at 34.

But several years before *Deans*, the United States Supreme Court held that when the prosecution fails "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests," the prosecution's derivative evidence can be excluded only if the defendant can show that the prosecution destroyed the primary evidence in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988).

The *Deans* court had distinguished *Youngblood*, holding that if the evidence is important enough and it is destroyed before the defense gets a chance to conduct its own tests, it must be excluded "irrespective of good faith or bad faith on the part of the prosecution." *Deans*, 610 A.2d at 518–20.  In *Illinois v. Fisher* (decided over a year before Yelverton's trial), the United States Supreme Court rejected an Illinois state court decision drawing the same distinctions as *Deans* and reiterated its *Youngblood* holding that "the failure to preserve [] potentially useful evidence does not violate due process *unless a criminal defendant can show bad faith on the part of the police*."  540 U.S. 544, 547–48 (2004) (emphasis in original) (quotations omitted).  In 2009, the Pennsylvania Supreme Court acknowledged that its holding and reasoning in *Deans* was overruled by *Fisher*.  *Commonwealth v. Snyder*, 963 A.2d 396 (Pa. 2009).

Yelverton concedes that *Deans* is "no longer good law," and seeks an evidentiary hearing "to assess whether the firearm was destroyed in 'bad faith,' and consequently whether PCRA counsel was ineffective in failing to raise the claim."  (Obj. to R&R at 8.)[11]  But again, *Shinn* held that a "state prisoner is responsible for counsel's negligent failure to develop the state postconviction record."  596 U.S. at 383.  Therefore, "when a state post-conviction attorney negligently fails to develop the facts needed to support a claim, 'a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements.'"

---

[11]    In *Lockhart v. Fretwell*, the United States Supreme Court held that ineffective assistance claimants are not "entitle[d] to the luck of a lawless decisionmaker."  506 U.S. 364, 370 (1993).  That is, when the petitioner's claim relies on case law that was good law during trial but subsequently overruled or abrogated, a federal court sitting in *habeas* review must apply the new law retroactively.  *Id.*

It is debatable whether *Deans* was even good law at the time of Yelverton's trial given *Fisher*'s clear holding a year prior.  But even assuming it was, the Pennsylvania Supreme Court expressly overruled *Deans* four years later.

*Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 723 (3d Cir. 2022) (quoting *Shinn*, 596 U.S. at 384).

Because PCRA counsel's failure to develop the factual record surrounding the destruction of the .45 caliber firearm is attributable to Yelverton, he is not entitled to an evidentiary hearing on the issue unless one of the § 2254(e)(2) exceptions is satisfied. Yelverton does not dispute that § 2254(e)(2)(A)(i) is inapplicable—that is, there is no new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable to him.  Rather, he contends that, under § 2254(e)(2)(A)(ii), the bad faith of the prosecution is a factual predicate that could not have been previously discovered through the exercise of due diligence.  (Obj. to R&R at 9.)[12]  He cites the purportedly unforeseeable change in law from *Deans* to *Snyder* as evidence that trial counsel could not have discovered—or rather, had no incentive to discover—the bad faith of the prosecution through due diligence.  This argument is unconvincing.  To start, *Illinois v. Fisher* was decided before his trial and put counsel on notice that a showing of bad faith was required.  Even if the change in law excused trial counsel's failure to develop the record, it does not excuse Yelverton's failure to do so in his PCRA proceedings.  *Snyder* was decided in January of 2009, but Yelverton filed his counseled first PCRA petition in March of 2010.  There was no excuse for failing to seek evidence of bad faith in his first PCRA proceedings.

---

[12]    Yelverton actually contends that § 2254(e)(2) does not apply at all because counsel's failure to develop the record was not due to a "fail[ure]" under § 2254(e)(2).  (Obj. to R&R at 9.)  He cites to *Williams v. Taylor*, 529 U.S. 420, 423 (2000), in which the Supreme Court held that 2254(e)(2)'s stringent requirements do not apply if counsel was not at fault for not developing the record.

But Yelverton fails to meaningfully address *Shinn* and *Williams v. Superintendent Mahanoy*—indeed, he does not even mention *Shinn*.  These cases make clear he must satisfy a 2254(e)(2) exception before securing an evidentiary hearing on his *Martinez* claim.  The Court therefore analyzes Yelverton's claim under 2254(e)(2)(A)(ii).

The state court record alone is insufficient to establish trial counsel's ineffectiveness. To start, Yelverton has not rebutted the presumption of counsel's reasonableness by "showing that no sound strategy . . . could have supported" her decision not to make a *Youngblood* motion. *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005). Rather, counsel was no doubt aware of facts that led a separate court to conclude that the firearm was "inadvertently destroyed," and thus not destroyed in bad faith, "because of a mistake in the property receipt numbers." *Commonwealth v. Yelverton*, CP-51-CR-0405401, at 3 (Pa. Ct. Comm. Pleas, 1st Jud. District Nov. 12, 2003). Therefore, counsel's decision not to make a *Youngblood* motion was reasonable. And any prejudice flowing from counsel's purported deficient performance was substantially reduced by the trial court's instructions to the jurors, which stated they were permitted to draw an adverse inference against the Commonwealth if it found "no satisfactory explanation" for the Commonwealth's failure to produce the firearm, and if the firearm: (1) was available to the prosecution but not the defense, (2) contained or showed special information material to an issue, and (3) would not be cumulative of other evidence. (Sept. 7, 2005 Tr. Transcript at 109-10.) The absence of the firearm was adequately addressed.

## C

Yelverton's next claim concerns the prosecutor asking the courtroom officers to take the names of people on Yelverton's side of the courtroom because of concerns about witness intimidation. (Aug. 26, 2005 Tr. at 144:20-145:5.)[13] Trial counsel objected to

---

[13]    The trial transcript does not indicate when the prosecutor said this, or whether it was said in front of the jury. The transcript reflects that, at some point after this occurred, defense counsel objected to the comment at sidebar, saying "before we took the break, I objected to Ms. Ruiz instructing the court officers . . . while the jury is sitting a few feet away from her, . . . to take the

the prosecutor's remark, leading the judge to reprimand the prosecutor for trying to "pollute this jury" and order that any concerns about witness intimidation by anyone in the courtroom be brought to her out of the presence of the jury.  (*Id.* at 145-147.) Yelverton believes trial counsel should have moved for a mistrial and a curative instruction.  This claim fails because the underlying ineffectiveness claim lacks merit and is not substantial.

Trial counsel did not perform deficiently in not moving for a mistrial.  As stated earlier, *supra* Section III.B, "[a] mistrial is an extreme remedy . . . [that] . . . must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial."  *Bracey*, 831 A.2d at 682.  A motion for a mistrial would have been based on a claim of prosecutorial misconduct, which "does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Commonwealth v. Robinson*, 877 A.2d 433, 441 (Pa. 2005).  Trial counsel reasonably concluded that seeking a mistrial stood little chance of success, particularly given the other evidence in the record that Yelverton sought to intimidate witnesses.  Yelverton argues that "[t]he sole instance of witness intimidation directly tied [to him] was the phone call[] between" him and Tyrek.  (Obj. to R&R at 12.)  But that is not the case— Theresa also testified that Michael Hinton told her that Yelverton had beat him up "all the time" in jail.  (Aug. 31, 2005 Tr. Transcript at 102:3-6.)  There was additional evidence of witness intimidation not directly tied to Yelverton, including flyers hung up

---

names of all the witnesses that are present on the defendant's side of the courtroom because of issues regarding intimidation of witnesses."  (Aug. 26, 2005 Tr. at 144:20-145:5.)

around the neighborhood implying the Commonwealth's witnesses were snitches.  *See, e.g.*, (Aug. 29, 2005 Tr. Transcript at 48:24-49:10).  Against the backdrop of this evidence, the unavoidable effect of the prosecutor's stray remark could not have been to deprive Yelverton of a fair trial.

Nor did trial counsel perform deficiently by not requesting a curative instruction. An attorney can reasonably decide not to seek a curative instruction because it "might have the undesired effect of highlighting" the disputed issue.  *See Buehl v. Vaughn*, 166 F.3d 163, 170 (3d Cir. 1999).  Here, proving witness intimidation was a large part of the Commonwealth's case, necessary to explain why their witnesses waited so long to come forward.  Trial counsel was reasonable for deciding that she did not want to highlight for the jury an insinuation of further witness intimidation that occurred a week and a half earlier.

In any event, the prosecutor's remark did not prejudice Yelverton.  As stated, there was substantial evidence of witness intimidation in the record.[14]  And the trial judge promptly addressed counsel's objection by ensuring it would not happen again.

### D

Yelverton next claims that trial counsel was ineffective for failing to obtain Tyrek's updated criminal history record and use it to impeach his credibility.  (Supp. Pet. at 24-25.)  He states Tyrek was arrested on August 24, 2004 and charged with five crimes, which were subsequently dismissed on February 7, 2005.  (*Id.*)  He believes that, had counsel found and used this information, it would have permitted the

---

[14]    Yelverton attempts to distinguish between witness intimidation outside the courtroom and inside the courtroom.  (Obj. to R&R at 12.)  He does not point to any case law supporting this distinction, which the Court finds to be one without a difference.

inference that Tyrek's charges were dropped as part of a deal with the Commonwealth. (*Id.* at 25.)

This claim lacks merit. The state criminal docket sheet for Yelverton's August 24, 2004 arrest and subsequent charges shows that these charges were discharged for lack of evidence, not dropped or *nolle prossed*. (ECF No. 52-1.) Without more evidence of a "deal," this could not have been used to impeach Tyrek, so trial counsel did not perform unreasonably in choosing not to try it. *See Commonwealth v. Reese*, 379 A.2d 1312, 1312-13 (Pa. 1977) ("The veracity of a witness may not be impeached by prior arrests which have not led to conviction. . . . [T]o hold that an arrest for an unrelated crime could be used to show a general bias would effectively vitiate the rule against impeaching on the basis of arrests alone.").

Second, there was minimal, if any, prejudice from trial counsel's decision not to attempt to impeach Tyrek with this information. To start, counsel *did* argue to the jury in both his opening and closing statements that Tyrek testified in exchange for favorable legal treatment from the Commonwealth. (Aug. 25, 2005 Tr. at 218:9-12) ("He made up a story to benefit himself because he got into trouble."); (Sept. 7, 2005 Tr. at 28:7-12) (noting that Tyrek Nelson only testified "when [he was] caught for other things that [he] decided, oh, I'm going to talk"). True, this argument dealt with a separate incident; on September 28, 2003, Tyrek gave his initial statement to police after being apprehended for fleeing from police, a crime he was never subsequently charged with. (Aug. 29, 2005 at 126-130.) But counsel's summation wouldn't have been much stronger with the further impeachment evidence. Further, Tyrek gave his initial statement to police *nine months* before the August 24, 2004 arrest. He then testified at

Yelverton's January 2004 preliminary hearing, seven months before his August 2004 arrest.  Yelverton has no other facts supporting his speculation that the August 2004 charges were dropped in exchange for his trial testimony.[15]

Yelverton concedes that his claim requires more facts and asks for an evidentiary hearing under § 2254(e)(2)(A)(ii), claiming he diligently raised the claim in his third PCRA petition.  (Reply at 7-9, ECF No. 63.)  Yelverton is not entitled to an evidentiary hearing.  To start, it is nonsensical to assert one's diligence in factual development of a claim by pointing to an untimely PCRA petition filed fifteen-years after trial and after not pursuing the same claim in two earlier petitions.  And again, before holding a hearing on whether a petitioner can overcome the default of a *Martinez* claim, a federal *habeas* court must first decide whether the underlying defaulted *habeas* claim "succeeds considering only the state court record."  *Williams v. Superintendent Mahanoy*, 45 F.4th at 724 (applying *Shinn*).  If the court concludes that the underlying claim is unsupported by the state court record, it "should deny relief without more."  *Id.* at 723–24.  That is the case here.

E

Yelverton's final procedurally defaulted claim is that he suffered prejudice from the cumulative effect of the trial counsel's ineffectiveness.  (Supp. Pet. at 31.)  This claim is meritless as well.

---

[15]    Yelverton recognizes the factual inadequacies to this claim, and ultimately rests it on an extremely thin reed.  He claims that, because Tyrek consented to the search of his vehicle after the chase in 2003, and because he was released on his own recognizance while his co-defendant was not, this "could indicate an ongoing relationship with the police and" DA's office.  (Obj. to R&R at 14.)  This is rank guesswork.

"The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." *Collins v. Sec'y of the Pa. Dep't of Corr.*, 742 F.3d 528, 542 (3d Cir. 2014). But in order for a claim to contribute to the cumulative error analysis, there must have been an error. In other words, ineffectiveness claims that failed to satisfy *Strickland*'s first prong are irrelevant. *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("A *habeas* petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors."); *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."); *Ragan v. Horn*, No. 00-cv-2092, 2016 WL 1241771, at *10 (E.D. Pa. Mar. 29, 2016) (citations omitted) ("The cumulative error doctrine requires the existence of 'errors' to aggregate. . . . [Z]ero plus zero is still zero.").

Here, each of Yelverton's ineffectiveness claims failed to satisfy *Strickland*'s first prong and there are no errors to aggregate.

V

A certificate of appealability should only be issued if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner must "demonstrate that reasonable jurists would find the District Court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Yelverton has made no such showing, so no certificate should issue.

An appropriate Order follows.

BY THE COURT:


 _/s/ Gerald J. Pappert_

Gerald J. Pappert, J.